UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

VICKIE LUDELL
WALLACE,

                   Plaintiff,

v.

COMMISSIONER OF
SOCIAL SECURITY,

                   Defendant.
_____/

Case No. 2:15-cv-11839
Judge Robert H. Cleland
Magistrate Judge Anthony P. Patti

## <u>REPORT AND RECOMMENDATION TO DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DE 13) AND GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DE 14)</u>

**I.**    **RECOMMENDATION**: For the reasons that follow, it is

**RECOMMENDED** that the Court **DENY** Plaintiff's motion for summary

judgment (DE 13), **GRANT** Defendant's motion for summary judgment (DE 14),

and **AFFIRM** the Commissioner's decision.

**II.**    **REPORT**

       Plaintiff, Vickie Ludell Wallace, brings this action under 42 U.S.C. § 405(g)

for review of a final decision of the Commissioner of Social Security

("Commissioner") denying her application for disability insurance (DI) benefits.

This matter is before the United States Magistrate Judge for a Report and

Recommendation on Plaintiff's motion for summary judgment (DE 13), the

Commissioner's cross motion for summary judgment (DE 14) and the
administrative record (DE 8).

### A.    Background

Plaintiff filed her application for DI benefits on October 29, 2012, alleging
that she has been disabled since February 17, 2010, at age 40.  (R. at 172-180, 191-
193.)[1]  Plaintiff alleges disability as a result of a back injury and herniated disc,
degenerative bone disease and depression.  (R. at 194-205.)  Plaintiff's application
was denied on February 21, 2013.  (R. at 112-139.)

On March 27, 2013, Plaintiff sought a *de novo* hearing before an
Administrative Law Judge ("ALJ").  (R. at 140-141.)  ALJ John Pope held a
hearing on November 14, 2013, at which Plaintiff was represented by counsel
(Andrea Hamm) and Vocational Expert (VE) Edward F. Pagella testified.  (R. at
42-101; *see also* R. at 149, 150, 171, 253.)  On November 27, 2013, ALJ Pope
determined that Plaintiff was not disabled within the meaning of the Social
Security Act.  (R. at 17-41.)

Plaintiff requested review of the hearing decision on December 13, 2013.
(R. at 14-16.)[2]  On April 9, 2015, the Appeals Council denied Plaintiff's request for

---

[1] A prior application resulted in a February 16, 2010 disposition awarding benefits
for a closed period (March 3, 2007 to August 1, 2009).  (*See* R. at 35, DE 13 at 8.)

[2] On January 6, 2014, the SSA granted Plaintiff's request for more time before
acting on her case.  (R. at 7-13.)

review.  (R. at 1-6.)  Thus, ALJ Pope's decision became the Commissioner's final decision.

Plaintiff then timely commenced the instant action on May 21, 2015.  (DE 1.)

**B.    Plaintiff's Medical History**

Plaintiff alleges in the field office disability report that she has been disabled since February 17, 2010.  (*See* R. at 191.)  Plaintiff's medical records span the period from March 18, 2011 to November 8, 2013.  (R. at 268-395 [Exhibits 1F-10F].)

**1.    Physical health records from 2011 through 2013**

It seems that Plaintiff treated with Luis Chapman, M.D., of Advantage Health Centers during February and March 2011.  (*See* R. at 341-344.)  Lab tests performed in early March 2011 appear to show an abnormal electrocardiogram (ECG) and high cholesterol levels.  (R. at 347-351.)  On April 7, 2011, Plaintiff underwent an x-ray of the thoracic spine, which revealed "mild spondylosis at the T6-T7 level anteriorly."  (R. at 318, 352, 353.)  She also underwent an x-ray of the cervical spine, which revealed "mild arthritic change of the C5-C6 level anteriorly."  (R. at 354.)  Plaintiff was again treated at Advantage Health Centers – apparently by Dr. Chapman - during April, May, June, July 2011 and October 2011.  (R. at 333-340, 346; *see also* R. at 345.)

On August 3, 2012, Plaintiff underwent an MRI of the lumbar spine, which revealed mild enhancing scar tissue along the posterior margin of the disc at the L5-S1 level, as well as evidence of anterior spinal fusion surgery at L5-S1.  (R. at 270-271, 279-280.)  Whole-body bone imaging performed on August 24, 2012 revealed, *inter alia*, focal areas of increased uptake, including the:  bilateral shoulders, lower lumbar spine, sacroiliac joints, bilateral hips, left knee, sternoclavicular joints, and bilateral feet, greater on the right.  (R. at 269, 282-283.) What appear to be Dr. Chapman's progress notes from the same date recommend follow up with a neurosurgeon.  (R. at 286-287, 331-332.)

Plaintiff saw Daniel Elskens, M.D., of Eastside Neurosurgery, P.C., on September 14, 2012.  Dr. Elskens diagnosed degeneration of the lumbar or lumbosacral intervertebral disc and lumbar pain.  (R. at 275-278.)  A September 17, 2012 x-ray of the lumbosacral spine revealed anterior fusion surgical changes at L5-S1, but no acute fracture dislocation or spondylolisthesis.  (R. at 268, 281.) On October 30, 2012, Plaintiff was again seen by Dr. Elskens, who again diagnosed degeneration of lumbar or lumbosacral intervertebral disc and lumbar pain.  (R. at 272-274.)

Plaintiff was seen at Advantage Health Centers – seemingly by Dr. Chapman – during November 2012 for a follow up visit.  (R. at 284-285, 329-330.) She was seen at Advantage Health Centers by Dr. Chapman, from November 27,

2012 to May 10, 2013; by Angela Allen, A.P.R.N., B.C., during October 2013; and by Crystal Lee-Billing, M.D. on October 18, 2013.  (R. at 323-328, 388-395.)

On August 7, 2013, Plaintiff was seen at the University Pain Clinic Detroit. Dr. Tolbert and/or Dr. Perov assessed postlaminectomy syndrome of the lumbar region and lumbosacral radiculopathy.  (R. at 306-310; *see also* R. at 311-315.)  A same-day urine test was positive for Alpha-Hydroxyalprazolam.  (R. at 303-305.) Thereafter, August 14, 2013, August 28, 2013 and September 11, 2013, Plaintiff received lumbar epidural steroid injection with fluoroscopy.  (R. at 297-298, 299-300, 301-302.)

On November 8, 2013, Dr. Lee-Billing completed a social security disability/ability form.  The listed diagnoses include lumbosacral radiculopathy and postlaminectomy syndrome of the lumbar region.  (R. at 382-383.)

### 2.    Mental health records from 2013

On or about January 29, 2013, Plaintiff underwent a consultative psychiatric evaluation by R. Hasan, M.D., who diagnosed, among other things, mood disorder, not otherwise specified (NOS), and a global assessment of functioning (GAF) score of 50, with a fair to guarded prognosis.  (R. at 288-290.)  During May, June and August of that year, Plaintiff treated at Eastwood Clinics with Sharon Masek, L.M.S.W.  (R. at 370-373, 378-381, 361, 366-367.)

Meanwhile, Plaintiff underwent psychiatric evaluation or treatment with V. Yeragani, M.D. of Eastwood Clinics, on several occasions:  June 7, 2013, July 8, 2013 and September 3, 2013.  (R. at 362-365, 374-377; R. at 359-360; and R. at 357-358).  Although these notes will be discussed in detail as necessary below, I note here that Dr. Yeragani's diagnoses included bipolar II disorder with depression (severe) and panic disorder with agoraphobia (moderate).  (R. at 365, 377.)

### C.   Hearing Testimony

#### 1.   Plaintiff's Testimony

At the November 14, 2013 hearing, Plaintiff testified that she was 44 years of age and married.  She lives in a multi-level house with her husband, her 23 years old son and her 2 year old granddaughter.  (R. at 48-49.)   Plaintiff is 5 feet 6 inches tall and weighs about 235 pounds.  She has an unrestricted driver's license.  (R. at 49.)  She graduated from high school.  (R. at 50.)

Plaintiff apparently last worked in 2007 or 2008, at which time she was working at Vitec "making tanks and different parts for Chrysler and Ford and GM."  (R. at 50-51; *see also* R. at 93.)[3]  She stopped that work, and filed a worker's compensation claim, because she was injured on the job.  She did not

---

[3] According to the administrative record, Plaintiff earned $3,222.47 in 2008.  (*See* R. at 186-190.)

6

return to work after her injury, explaining that she had been terminated.  According to Plaintiff, unemployment benefits were denied.  (R. at 51.)  She has since looked for work in the health care field, but was unable to undertake such work because of her limitations with lifting, pulling and turning.  (R. at 52-53.)  Plaintiff also testified that she has problems with standing, walking, sitting, lifting and carrying. (R. at 54; *see also* R. at 81-83, 85-86, 91.)  There is no position she can be in for a long time.  (R. at 87.)

### a.    Testimony about physical conditions

With respect to physical conditions, Plaintiff testified she has a problem with her back and is constantly in pain.  (R. at 53; *see also* R. at 78.)  Her lower back pain sometimes radiates.  (R. at 78-79; *see also* R. at 80.)  She had an L5-S1 lumbar discectomy in February 2009 and was told it would take two years to heal. (R. at 55, 57; *see also* R. at 273, 276.)  She had an MRI in 2012 and was offered surgery by Dr. Elskens, but refused.  (R. at 58-59.)  She has also received treatment for her back from Dr. Chapman, including physical therapy and medication.  (R. at 59-61.)  Plaintiff testified that Dr. Chapman told her to not lift more than a gallon of milk, *i.e.*, a 5 pound restriction, and not do a lot of bending.  (R. at 62, 81.)  She has also received steroid injections, seemingly from Dr. Perov at University Pain Clinic.  (R. at 61-62; *see also* R. at 79-80, 297-302.)  These help for a week or so, after which her pain returns to 10 on a scale of 1 to 10.  (R. at 87-88.)

Plaintiff testified that, in a typical day, she gets up at 8 a.m. and takes pain medication, apparently Ibuprofen 800 mg.  (R. at 65-66, 80; *see also* R. at 87.)  The pain in her back makes it difficult to walk downstairs.  She eats breakfast around 9 a.m.  (R. at 66.)  She takes care of her granddaughter from 11 a.m. to 2 p.m. while her son is at school.  Everyday chores might take her a whole day, because she cannot do a lot of standing or walking.  (R. at 67-68; *see also* R. at 85-86.)  She lies down at least 3-4 times per day for 20 or 30 minutes, as it relieves pressure.  (R. at 86.)  When she is active, her pain increases.  (R. at 81.)  Sometimes, she does not eat lunch, although she makes lunch for her granddaughter around 12:00 p.m. or 12:30 p.m.  (R. at 68.)  She begins the evening meal around 5:00 p.m. and eats around 6:00 p.m. or 6:30 p.m.  In the evenings, she will go upstairs and attempt to rest or sit down.  (R. at 69.)  If the dinner dishes are not washed, she will get back up at 8 p.m.  After doing the dishes, she goes back to bed and watches television.  She takes pain medication between 8:00 p.m. and 9:00 p.m. and falls asleep around 10 p.m.  (R. at 70.)

Plaintiff testified that she can dress herself, shower and wash her hair or take a bath.  She shops and does laundry.  Her only hobbies are going to church and trying to visit her other grandchildren.  (R. at 71; *see also* R. at 75-77, 90-91.)  She likes listening to music and also coloring, which sometimes takes her mind off of

her pain.  (R. at 89.)  She learned physical therapy exercises, but she does not do

them.  She also does not exercise.  (R. at 71-72.)

### b.   Testimony about psychological conditions

Plaintiff testified that she is receiving treatment at Eastwood Clinic from

psychiatrist Dr. Yeragani and therapist Masek.  (R. at 72-73.)  She recently began

taking Elavil (amitriptyline), Flexeril, Prolypterall[4] and Trazodone, as well as

Xanax, all prescribed by Dr. Yeragani.  (R. at 62-63; *see also* R. at 80.)  The side

effects include distraction.  (R. at 64.)  She is still having "ups and downs" with her

mood, but does not want to increase her medication.  (R. at 89-90.)  Plaintiff gets

panic attacks when she is upset or depressed (approximately once per month).

These episodes are scary for her, as she cannot breathe and thinks she is dying.  (R.

at 73-74.)

Plaintiff testified that she is forgetful, distracted, and her concentration is

off, but she believes treatment with Dr. Yeragani is "a start."  (R. at 75; *see also* R.

at 78, 91.)  She is sometimes able to follow a 30 minute program on television.  (R.

at 88.)  She sometimes has problems getting along with "casual contacts."  (R. at

77-78.)  Although she does not have physical problems driving, she has problems

remembering where she is going.  (R. at 84.)  She attributes her depression, at least

---

[4] The Court suspects this may be a reference to Trileptal.  (*See* R. at 365, 377, 388
& 393.)  Also, I note that, instead of Flexeril, Dr. Yeragani's notes list Celexa.
(*See* R. at 365, 377.)

in part, to the loss of her job and the loss of her income. (R. at 84-85; *see also* R. at 90.) She began staying to herself after she lost her job. (R. at 90.)

### 2.    Vocational Expert Testimony

VE Pagella testified that a hypothetical individual with a high school graduation level and 40-44 years of age but who is limited to only unskilled light exertion involving only occasionally balancing, stooping, kneeling, crouching, crawling and climbing would be able to perform claimant's past work as an assembler. (R. at 93-94.)

The VE also testified that such an individual who is further limited to sedentary work (lifting no more than five pounds frequently, 10 pounds occasionally) and jobs that require only minimal focus and concentration (defined as simple one and two-step tasks) would be able to perform work as a hand sorter, assembler and packer. Such an individual who is further limited to occasional contact with the public and the ability to alternate sitting and standing would be able to perform the same jobs. (R. at 94.) Upon cross-examination by Plaintiff's counsel, the VE further testified that if the individual was limited to lifting no more than 5 pounds, it would result in a less than sedentary work capability. (R. at 98-99.) Finally, the VE testified that the limitations of no contact with coworkers and work not depending on someone else doing his or her job would preclude the jobs outlined in response to the second hypothetical. (R. at 99-100.)

10

### D.      The Administrative Decision[5]

ALJ Pope rendered his decision on November 27, 2013.  (R. at 17-41.)  At

Step 1, he found that Plaintiff has not engaged in substantial gainful activity since

February 17, 2010, the alleged onset date.  (R. at 22.)

At Step 2, the ALJ found that Plaintiff has the following severe impairments:

osteoarthritis; degenerative disc disease, status post lumbar spinal fusion and

discectomy; postlaminectomy syndrome of the lumbar region; lumbosacral

radiculopathy; mood disorder; depression; severe bipolar disorder with depression;

and moderate panic disorder with agoraphobia.  (R. at 22.)

------

[5] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §404.1520(a)(4); see also 20 C.F.R. § 416.920.  Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.      Is the claimant engaged in substantial gainful activity?
2.      Does the claimant suffer from one or more severe impairments?
3.      Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.      Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5.      Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

At Step 3, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments.  (R. at 22-24.)

At Step 4, the ALJ found that Plaintiff has the RFC to perform light work with certain postural limitations (only occasional balancing, stooping, kneeling, crouching, crawling and climbing) and a limitation to unskilled work.  (R. at 24-36.)  Moreover, the ALJ found that Plaintiff is capable of performing her past relevant work as an assembler, as this work does not require the performance of work-related activities precluded by her RFC.  (R. at 36.)

Alternatively, at Step 5, having considered Plaintiff's age, education, work experience, and RFC, the ALJ found that there are other jobs that exist in significant numbers in the national economy that Plaintiff also can perform.  (R. at 36-38.)

### E.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. at 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see*

*also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a

decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

**F.     Analysis**

Plaintiff argues that the ALJ's decision that Plaintiff had the RFC to perform light work with postural limitations and a skill-level limitation was not supported by substantial evidence, because the ALJ did not (a) properly weigh the opinion of Dr. Crystal Lee-Billing, Plaintiff's treating physician; (b) comply with 20 C.F.R. §§ 404.1527, 416.927 when rejecting the treating physicians' opinions; (c) have support for his physical RFC assessment; and (d) properly assess Plaintiff's mental RFC.  (DE 13 at 7, 22-31.)

The Commissioner contends that substantial evidence supports the ALJ's assessment of Plaintiff's RFC, because the ALJ properly assessed (a) Dr. Lee-Billing's opinion; (b) Dr. Elskens's treatment notes; (c) Plaintiff's physical RFC; and (d) Plaintiff's mental RFC.  (DE 14 at 3, 11-19.)

**1.     Substantial evidence supports the ALJ's physical RFC determination (light work exertional and postural limitations).[6]**

---

[6] As listed in the Disability Determination Explanation form, exertional limitations include lifting, carrying, standing, walking, sitting, pushing and pulling.  Postural limitations include climbing, balancing, stooping, kneeling, crouching and

14

a.      **The ALJ properly weighed the opinion evidence.**

i.      **Evaluating opinion evidence under 20 C.F.R. §§ 404.1527, 416.927**

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case.  20 C.F.R. §§ 404.1527(b), 416.927(b).  The regulations define medical opinions as "statements from physicians . . . that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2).  "Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists."  20 CFR §§ 404.1527(e)(2)(i), 416.927(e)(2)(i).  The ALJ must, however, "consider findings and other opinions" of State Agency medical or psychological consultants.

The ALJ generally gives deference to the opinions of a treating source "since these are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the

---

crawling, while exertional limitations include lifting, carrying, standing, walking, sitting, pushing and pulling.  (R. at 119, 131.)

objective medical findings alone . . . ."  20 C.F.R. §§ 404.1527(c)(2),

416.927(c)(2); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009).

To qualify as a treating source, the physician must have an "ongoing treatment

relationship" with the claimant.  20 C.F.R. §§ 404.1502, 416.902.

 If the ALJ does not afford controlling weight to a treating physician's

opinion, the ALJ must meet certain procedural requirements.[7]  *Wilson v. Comm'r*

*of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  Specifically, if an ALJ does not

give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors—namely, the length of the
> treatment relationship and the frequency of examination, the nature
> and extent of the treatment relationship, supportability of the opinion,
> consistency of the opinion with the record as a whole, and the
> specialization of the treating source—in determining what weight to
> give the opinion.

*Id.; see also* 20 C.F.R. §§ 404.1527(c), 416.927(c).

---

[7] An exception exists for treating source opinions on issues that are reserved to the
Commissioner, which "are never entitled to controlling weight or special
significance."  S.S.R. 96-5p, 61 FR 34471-0, at *34473.  Examples of issues
reserved to the Commissioner include:

> 1. Whether an individual's impairment(s) meets or is equivalent in
> severity to the requirements of any impairment(s) in the listings;
> 2. What an individual's RFC is;
> 3. Whether an individual's RFC prevents him or her from doing past
> relevant work;
> 4. How the vocational factors of age, education, and work experience
> apply; and
> 5. Whether an individual is "disabled" under the Act.

*Id.*

However, while an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion,"  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2), and  "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight," *Friend v. Comm'r of Soc. Sec.*, No. 09-3889, 375 F. App'x 543, 550 (6th Cir. 2010) (per curiam) (internal quotation omitted), there is no *per se* rule that requires a written articulation of each of the six regulatory or "*Wilson* factors" listed in 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6). *Norris v. Comm'r of Soc. Sec.*, No. 11–CV–11974, 2012 WL 3584664, at *5 (E.D. Mich. Aug. 20, 2012) (citing *Tilley v. Comm'r of Soc. Sec*., 394 F. App'x 216, 222 (6th Cir.2010)). In other words, the regulations do not require "an exhaustive factor-by-factor analysis." *Francis v. Commissioner Social Sec. Admin*., 414 F.App'x 802, 804-805 (6th Cir. 2011) (citing § 404.1527(d)(2)).

Moreover, the failure to discuss the requisite factors may constitute harmless error: (1) if "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it;" (2) "if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion;" or (3) "where the Commissioner has met the goal of [§ 1527(c) ]–the provision of the procedural safeguard of reasons–even though she has not complied with the terms

of the regulation." *Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 470 (6th Cir.2006) (quoting *Wilson* , 378 F.3d at 547).  *See also, Betty v. Comm'r of Soc. Sec.,* No. 15-CV-10734, 2016 WL 1105008, at *4 (E.D. Mich. Feb. 17, 2016), *report and recommendation adopted*, No. 15-CV-10734-DT, 2016 WL 1090554 (E.D. Mich. Mar. 21, 2016).

The United States Court of Appeals for the Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45.  Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled." *Germany-Johnson v. Comm'r of Soc. Sec.*, 312 F. A'ppx 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242).

For the reasons stated below, I find that the ALJ's opinion gives good reasons for discounting the medical opinions at issue and that the Commissioner has met the goal of 20 C.F.R. §§ 404.1527(c), 416.927(c).  *Francis*, 414 F.App'x at 805  (quoting *Wilson,* 378 F.3d at 547).  I also find that the opinion "'permits the

claimant and [this] reviewing court a clear understanding of the reasons for the weight given [the] treating physician's opinion[.]'" *Francis,* 414 F.App'x at 805 (quoting *Friend*, 375 F.App'x at 550).

### ii.       Crystal Lee-Billing, M.D. (treating physician)

Plaintiff contends that the ALJ failed to comply with 20 C.F.R. §§ 404.1427(c), 416.927(c) in assigning weight to the opinion of Dr. Lee-Billing, Plaintiff's treating physician.  (DE 13 at 22-25.)[8]  In a November 8, 2013 social security disability/ability form, Dr. Lee-Billing opined that Plaintiff's exertional limitations include lifting less than 5 pounds, and pushing, pulling and carrying no more than 5 pounds.  She also opined that Plaintiff is unable to bend and has limitations on fine finger manipulation.  (R. at 382-383.)

The ALJ assigned "little weight" to this opinion.  Here, the Court should conclude that the ALJ properly discounted, or declined to give controlling weight to, this assessment by Dr. Lee-Billing.  While acknowledging that Dr. Lee-Billing is a treating source, the ALJ noted:

> Dr. Lee-Billing's extremely limiting opinion is inconsistent with the record as a whole, which contains some evidence of degenerative disc disease related pain and occasionally reduced spinal range of motion and straight leg raising, but otherwise normal upper and lower

---

[8] These regulatory factors include examining relationship, treatment relationship, supportability, consistency, specialization and other factors.  20 C.F.R. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6).

19

> extremity strength, full extremity range of motion, and generally
> normal gait and station . . . .

(R. at 34.)  As cited in support of the ALJ's opinion, Dr. Elskens's September 14,

2012 and October 30, 2012 musculoskeletal notes do, in fact, indicate normal gait

and station, and notes from the September 14, 2012 visit also describe normal

range of motion, muscle strength and tone, and stability in the right and left upper

and lower extremities.  (R. at 273, 277 [Ex. 2F].)  Likewise, although Drs. Tolbert /

Perov's August 7, 2013 musculoskeletal notes indicate some limitations in spinal

range of motion and a straight leg raise test which was positive on the left, these

notes also indicate normal range of motion in the right and left lower extremities.

(R. at 308-309 [Ex. 5F].)  Having acknowledged Dr. Lee-Billing's status as a

treating physician, but also having explained how her opinion was inconsistent

with the record as a whole, the ALJ sufficiently complied with 20 C.F.R. §§

404.1527(c), 416.927(c).  *See Francis*, 414 F. App'x at 804-805 ("Here, the ALJ

acknowledged Dr. Wakham's role as Francis's 'treating family osteopath.'  In

assigning no weight to his opinion, the ALJ cited the opinion's inconsistency with

the objective medical evidence, Francis's conservative treatment and daily

activities, and the assessments of Francis's other physicians.  Procedurally, the

regulations require no more.").

In addition to the ALJ's consideration of consistency (20 C.F.R. §§

404.1527(c)(4), 416.927(c)(4)), it is worth noting that the record appears to contain

20

only October 18, 2013 progress notes (R. at 388-389), a same-day medication list (R. at 392) and the November 8, 2013 social security disability form (R. at 382-383) by Dr. Lee-Billing.  The remaining notes from Advantage Health Centers appear to have been documented by Dr. Chapman and Angela Allen, A.P.R.N., B.C.  (R. at 284-287 [Ex. 3F], 323-344, 346, 351 [Ex. 7F], 388-395 [Ex. 10F].)  As appropriately noted by the Commissioner, Plaintiff's brief does not indicate the length of her treatment relationship with Dr. Lee-Billing, and, aside from the November 8, 2013 form (R. at 382-383), the record reveals only one visit with this physician.  (DE 13 at 22-25, DE 14 at 13, R. at 388-389, 392.)  Consistent with this, Plaintiff referred to her as a "new doctor" in her hearing testimony.  (R. at 59.)  Thus, consideration of the "length of the treatment relationship and the frequency of examination," 20 C.F.R. §§ 404.1527(c)(2)(i), 416.927(c)(2)(i) would not operate in Plaintiff's favor, as Dr. Lee-Billing fails to provide the "longitudinal picture" or the "unique perspective" which lends weight to the opinions of "treating sources."  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

### iii.       Daniel Elskens, M.D. (treating neurosurgeon)

Plaintiff also contends that the ALJ did not give proper weight to the opinions and assessments of treating physician Dr. Elskens as required by 20 C.F.R. §§ 404.1527, 416.927 and SSR 96-2p.  (DE 13 at 25-27.)  As noted above, Plaintiff was seen by Dr. Elskens of Eastside Neurosurgery on September 14, 2012

and October 30, 2012.  Each time, the diagnoses were degeneration of lumbar or lumbosacral intervertebral disc and lumbar pain.  (R. at 272-278.)  However, while the medical advice at the first visit included home exercise and initiation of physical therapy, the medical advice at the latter visit included review of posterior fusion versus spinal cord stimulation as treatment options.  (R. at 274, 278.)

Although the ALJ did not make an express assignment of weight to these opinions, it is not clear that he was required to do so.  "Controlling weight may be given only in appropriate circumstances to *medical opinions*, i.e., opinions on the issue(s) of the nature and severity of an individual's impairment(s), from treating sources."  SSR 96-2P (S.S.A. July 2, 1996) (emphasis added).  "*Medical opinions* are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2) (emphasis added).  While the "assessments" in Dr. Elskens's treatment notes arguably constitute medical opinions, the "plans" do not offer an opinion on Plaintiff's ability to function, such as from an exertional, postural, manipulative, visual, communicative or environmental standpoint.  *See Winter v. Comm'r of Soc. Sec.*, No. 12-11962, 2013 WL 4604782, at *9 (E.D. Mich. Aug. 29, 2013) ("But Dr. Scaddan [Plaintiff's treating physician] never

22

opined on what he believed [Plaintiff] could still do in view of her symptoms; in other words, he offered no opinion on his patient's ability to function."). In other words, it does not appear that the ALJ was required to expressly assign weight to either Dr. Elskens's September 2012 discussion of home exercise or direction to initiate physical therapy or his October 2012 review of Plaintiff's treatment options. (R. at 273-274, 278.)

Moreover, the ALJ expressly discussed these visits, including Dr. Elskens's review of posterior fusion versus spinal cord stimulation as treatment options. (R. at 28, 29.) Then, the ALJ relied upon Dr. Elskens's notes from these visits in support of his finding that Plaintiff has the RFC to perform the exertional requirements of light work. Specifically, citing notes from both the University Pain Clinic (Ex. 5F) and Eastside Neurosurgery (Ex. 2F), the ALJ explained that Plaintiff's upper and lower extremity strength, intact sensation, full range of motion and/or generally normal gait and station support Plaintiff's ability (a) to perform the lifting and carrying requirements of light work and (b) to perform the significantly reduced standing, walking, and sitting requirements of light work, totaling six hours per day. (R. at 31.) In fact, both the September 14, 2012 and the October 30, 2012 musculoskeletal examinations revealed normal gait and station. (R. at 273, 277.) Also, the October 30, 2012 neurologic examination indicated, "[n]ormal mental status, cranial nerves, motor system, sensory system and

reflexes." (R. at 273.) Therefore, Plaintiff is simply incorrect that the ALJ ignored Dr. Elskens's consideration of another fusion or a spinal cord stimulator. (*Compare* DE 13 at 26, R. at 29).

### iv.  Muhammad Khalid, M.D. (non-examining state agency medical consultant)

Plaintiff also alleges that there is no support for the ALJ's physical RFC assessment and that "the record is devoid of any RFC assessments from any physicians." (DE 13 at 27-29.) Within this argument, Plaintiff contends the ALJ "did not perform the function-by-function assessment required by SSR 96-8p . . . ." (DE 13 at 27-28.)

In fact, the administrative record contains the January 14, 2013 opinion of non-examining state agency medical consultant Muhammad Khalid, M.D. (R. at 118-120, 130-132.) Among other things, Dr. Khalid opined that Plaintiff has the exertional limitations of being able to lift and/or carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk for a total of approximately 6 hours in an 8-hour workday, and sit for a total of approximately 6 hours in an 8-hour workday. Dr. Khalid further opined that Plaintiff has the postural limitations of occasional climbing, balancing, stooping, kneeling, crouching and crawling. (R. at 119, 131.) In addition, he explained that, having reviewed the medical evidence of record and the activities of daily living, Plaintiff was assessed for a light RFC finding. (R. at 120, 132.)

24

In assigning this opinion "great weight," the ALJ acknowledged that Dr. Khalid did not physically examine Plaintiff.  (R. at 34.)  Nonetheless, "[s]tate agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation."  20 C.F.R. § 404.1527(e)(2)(i), 416.927(e)(2)(i).  "[A]n ALJ can properly rely on the conclusions of a non-examining, record reviewing physician to support an RFC assessment."  *Gazella v. Comm'r of Soc. Sec.*, No. 13-11099, 2014 WL 555192, at *11 n.2 (E.D. Mich. Feb. 12, 2014) (Zatkoff, J., adopting report and recommendation of Hluchaniuk, M.J.);[9] *see also McGrew v. Comm'r of Soc. Sec.*, 343 F.App'x 26, 32 (6th Cir. 2009) (where the ALJ properly considered the opinions of two state agency physicians).  Were this not the case, and if ALJs were utterly bound to rubber-stamp the opinions of treating sources regardless of the 20 C.F.R. §§ 404.1527(c), 416.927(c) considerations, one would have to ask rhetorically what the point of obtaining a consulting opinion could possibly be.

Moreover, the ALJ noted that Dr. Khalid's opinion was:

---

[9] *See also Hirschback v. Colvin*, No. 1:12-CV-713, 2013 WL 6147883, at *3 (S.D. Ohio Nov. 22, 2013) ("After assessing the weight afforded to medical source evidence, ultimately, an ALJ can properly rely on the conclusions of a nonexamining, record reviewing physician to support an RFC assessment."), *report and recommendation adopted sub nom. Hirschback v. Comm'r of Soc. Sec.*, No. 1:12CV713, 2014 WL 1271027 (S.D. Ohio Mar. 27, 2014).

> . . . consistent with the record as a whole, which contains evidence of
> degenerative disc disease related pain and occasionally reduced spinal
> range of motion and straight leg raising, but otherwise normal upper
> and lower extremity strength, full extremity range of motion, and
> generally normal gait and station (Exhibit 2F, 3F, 4F, 5F, 7F).

(R. at 34.)  As mentioned earlier, these observations are consistent with the

musculoskeletal examinations of Dr. Elskens and Drs. Tolbert / Perov.  (R. at 272-

274 [Ex. 2F], 275-278 [Ex. 2F], 306-310 [Ex. 5F].)  Where, as here, the non-

examining source's opinion is consistent with the overall record and the treating

source's opinion is not, the ALJ is permitted to give greater weight to the former

than to the latter. SSR 96-6P (S.S.A. July 2, 1996) ("In appropriate circumstances,

opinions from State agency medical and psychological consultants and other

program physicians and psychologists may be entitled to greater weight than the

opinions of treating or examining sources."); *see also Thomas v. Comm'r of Soc.*

*Sec.*, No. 12-11545, 2013 WL 4550198, at *13 (E.D. Mich. Aug. 28, 2013) ("the

examining and reviewing state agency physicians described essentially consistent

findings regarding plaintiff's functional limitations, and the ALJ reasonably gave

some weight to the opinions of those physicians.").  Having explained how Dr.

Khalid's opinion was consistent with the record as a whole, the ALJ sufficiently

complied with 20 C.F.R. §§ 404.1527(c), 416.927(c).  *See Francis*, 414 F. App'x at

804-805.  APP:  I would adjust this section to make it align with any changes to the

parallel discussion under Dr. Lee-Billing.  [Not sure what you are proposing.
Please quickly show me your proposed revision.]

### e.    Conclusion

The ALJ properly discounted, or declined to give controlling weight to, the
opinions of the consultative examiner and treating physician and appropriately
gave significant weight to the opinion of the state agency medical consultant.
Therefore, the Court should conclude that the ALJ properly evaluated the opinion
evidence in this case in accordance with 20 C.F.R. §§ 404.1527(c), 416.927(c).

### 2.    Substantial evidence supports the ALJ's mental RFC determination (limited to unskilled work).

Plaintiff argues that the ALJ did not assess Plaintiff's mental RFC in
accordance with SSR 96-8p and/or SSR 85-15, namely that the ALJ did not
consider the impact of Plaintiff's Step 2 severe mental impairments (mood
disorder, depression, severe bipolar disorder with depression, and moderate panic
disorder with agoraphobia) on her functional ability.  (DE 13 at 29-31.)

SSR 96-8p, which concerns assessing RFC in initial claims, provides, in
part:  "The RFC assessment must first identify the individual's functional
limitations or restrictions and assess his or her work-related abilities on a function-
by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR
404.1545 and 416.945."  SSR 96-8p (S.S.A. July 2, 1996).  "Only after that may
RFC be expressed in terms of the *exertional levels* of work, sedentary, light,

medium, heavy, and very heavy." *Id*. (emphasis added). As *to non-exertional capacity*, the rule further provides: "*Work-related mental activities* generally required by competitive, remunerative work include the abilities to: understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting." *Id*. (emphasis added); *see also Calloway v. Comm'r of Soc. Sec.*, No. 15-10020, 2016 WL 1165948, at *7 (E.D. Mich. Mar. 1, 2016), *report and recommendation adopted*, No. 15-10020, 2016 WL 1161529 (E.D. Mich. Mar. 23, 2016) (citing SSR 96–8p, 1996 WL 374184, at *6 (July 1, 1996)). In other words, "SSR 96–8p requires an ALJ to individually assess the *exertional* (lifting, carrying, standing, walking, sitting, pushing, and pulling), and *non-exertional* (manipulative, postural, visual, communicative, and mental functions) capacities of the claimant in determining a claimant's RFC." *Delgado v. Comm'r of Soc. Sec.*, 30 F. App'x 542, 547 (6th Cir. 2002) (emphasis added).

However, "[a]lthough SSR 96–8p requires a 'function-by-function evaluation' to determine a claimant's RFC, case law does not require the ALJ to discuss those capacities for which no limitation is alleged." *Delgado*, 30 F. App'x at 547. Instead, the ALJ "'need only articulate how the evidence in the record supports the RFC determination, discuss the claimant's ability to perform sustained

work-related activities, and explain the resolution of any inconsistencies in the

record.'" *Id.* (quoting *Bencivengo v. Comm'r of Soc. Sec.,* No. 00–1995, 251 F.3d

153, slip op. at 5 (3d Cir. Dec. 19, 2000)).

### a.    The ALJ adequately discussed Plaintiff's mental limitation to unskilled work.

At Step 2, the ALJ concluded that Plaintiff's severe impairments, which

included mood disorder, depression, sever bipolar disorder with depression and

moderate panic disorder with agoraphobia – "interfere more than minimally with

[Plaintiff's] ability to perform basic work tasks . . . ." (R. at 22.) ALJ Pope then

considered Plaintiff's mental health records - the January 29, 2013 consultative

psychiatric evaluation by Dr. Hasan (R. at 288-290), the 2013 records from

psychiatrist Dr. Yeragani (R. at 357-367) and the 2013 records from Eastwood

Clinic (R. at 370-383) – in multiple places.

To begin, at Step 3, in concluding that Plaintiff has mild restrictions in

activities of daily living, the ALJ stated: "The fact that the claimant is able to care

for her young granddaughter each day without supervision, shows that *she retains*

*mental capabilities* exceeding her testimonial reports[,]" and "it would seem that

any limitations in this domain are secondary to her physical *rather than mental*

*impairments*." (R. at 23 (emphases added).) Then, the ALJ cited Plaintiff's mental

health records in his conclusions that Plaintiff had mild difficulties in social

functioning and moderate difficulties with regard to concentration, persistence or

pace (CPP).  (R. at 23-24.)

Next, at Step 4, the ALJ expressly considered Plaintiff's mental health

records in great detail.  (*See, i.e.,* R. at 29-30.)  Perhaps most importantly, the

ALJ's Step 4 discussion of Plaintiff's mental health records explains the

determination that Plaintiff's mental RFC is limited to unskilled work.  For

example, the ALJ observed:

> Turning to the claimant's mental impairments, the foregoing record
> contains evidence of mood disorder, depression, bipolar disorder, and
> panic disorder with agoraphobia, which would reasonably interfere
> with her ability to perform skilled tasks.  Mental status examinations
> have revealed occasional cognitive distortion and short-term memory
> problems and occasionally impaired judgment and impulse control,
> and although the claimant has been compl[ia]nt with medication and
> recent formal mental health treatment, she continues to demonstrate
> some mood abnormalities (Exhibit 4F, 8F, 9F).  As a result, the
> claimant is limited to unskilled work.  However, additional limitations
> are not warranted, as examinations have revealed normal orientation,
> generally normal thought processes and thought content, generally fair
> memory skills, and intact attention and concentration *(Id.).*  In
> addition, despite some indications of agoraphobia and reports of panic
> attacks, the claimant has been cooperative[10] and demonstrated fair
> eye contact on examination (hearing testimony, Exhibit 4F, 8F, 9F).
> Thus, it is clear that she retains the residual mental capacity to
> perform unskilled work.

---

[10] In addition, Plaintiff's October 29, 2012 SSA field office disability report notes
that Plaintiff was cooperative.  (*See* R. at 192.)

(R. at 32.)[11]   The ALJ also considered the Eastwood Clinics records in observing

that "[t]he behavioral health record is significantly limited and sporadic."  Among

other things, the ALJ noted that Plaintiff "has not required emergency

hospitalization or inpatient psychiatric treatment."  (R. at 33.)  Moreover, the ALJ

considered Plaintiff's mental health records in arriving at the conclusion that, since

ALJ Freeman's February 16, 2010 partially favorable disposition, "the updated

record does contain evidence of mental impairment . . .[,]" warranting the inclusion

of mood disorder, depression, bipolar disorder and panic disorder with agoraphobia

as severe impairments and indicating that Plaintiff is limited to unskilled tasks.  (R.

at 35.)

        The absence of a "detailed" function-by-function analysis is not required by

SSR 96-8p.  *Delgado v. Comm'r of Soc. Sec.*, 30 F. App'x 542, 547 (6th Cir. 2002)

("'Although a function-by-function analysis is desirable, SSR 96–8p does not

---

[11] These observations seem to be supported by Dr. Elsken's September 14, 2012 psychiatric observations (R. at 275-278 [Ex. 2F]), psychiatrist Dr. Hasan's January 29, 2013 notes (R. at 288-290 [Ex. 4F]), therapist Masek's May 3, 2013 intake assessment form (R. at 378-381 [Ex. 9F]), Masek's May 3, 2013 outpatient progress notes (R. at 370 [Ex. 9F]), Masek's May 21, 2013 progress notes (R. at 371 [Ex. 9F]), Masek's June 3, 2013 outpatient progress notes (R. at 367, 372 [Ex. 8F]), Dr. Yeragani's June 7, 2013 psychiatric evaluation (R. at 362-365 [Ex. 8F], 374-377 [Ex. 9F]), Masek's June 14, 2013 outpatient progress notes (R. at 373 [Ex. 9F]), the July 8, 2013 assessment by Dr. Yeragani / Masek (R. at 359-360 [Ex. 8F]), Drs. Tolbert's / Perov's August 7, 2013 notes from the University Pain Clinic Detroit (R. at 306-310 [Ex. 5F]), and Masek's August 20, 2013 progress notes (R. at 366 [Ex. 8F]).  Additionally, I note that the ALJ's statement that there is evidence of depression, bipolar disorder and panic disorder with agoraphobia is consistent with Dr. Lee-Billing's October 2013 progress notes.  (R. at 388.)

require ALJs to produce such a detailed statement in writing.'") (quoting

*Bencivengo,* slip op. at 4). Moreover, the ALJ discussed Plaintiff's behavioral

health records throughout his decision and explained the determination that

Plaintiff is limited to unskilled work. In other words, he articulated "how the

evidence in the record supports the RFC determination . . . ." *Delgado*, 30 F.App'x

547. The ALJ performed an extensive, if not exhaustive, discussion of Plaintiff's

mental health records (R. at 29-30, *see also* R. at 26, 31) and then explained the

effect of her mental health impairments on her ability to work. (*See* 32-33, *see*

*also* R. at 35). Plaintiff's characterization of this effort as a failure "to properly

assess" is misplaced. (DE 13 at 29.) The ALJ's assessment was proper and

thorough.

In reality, Plaintiff appears to take issue with the ALJ's *weighing of the*

*evidence*, and seeks to reverse the *conclusion*, but this is not permitted by the

applicable standard of review. The Court cannot re-weigh this evidence in favor of

Plaintiff simply because there is evidence in the record supporting an opposite

conclusion. *See VanSingel v. Comm'r of Soc. Sec.*, 26 F. App'x 488, 489 (6th Cir.

2002) ("If supported by substantial evidence, the Commissioner's decision must be

affirmed, even if [the reviewing court] would have arrived at a different result.")

(citing *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir.1983)); *Mullen v.*

*Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (concluding that "[a]n administrative

decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.").   The ALJ's determination that Plaintiff's mental RFC is limited to unskilled work is supported by substantial evidence, is consistent with SSR 96-8p, and should be upheld.

> **b.   The ALJ made appropriate assignments of weight with respect to the behavioral health evidence of record.**
>
> > **i.   The ALJ was permitted to discredit the GAF scores.**

The ALJ's decision makes several references to Plaintiff's global assessment of functioning (GAF).  For example, Dr. Hasan's January 29, 2013 GAF assessment was 50 (R. at 290), therapist Masek's May 3, 2013 GAF assessment was 60 (R. at 380), and Dr. Yeragani's June 7, 2013 GAF assessment was 50 (R. at 365, 377).  By way of background, "[a] 41–50 reflects the assessor's opinion that the subject has serious symptoms *or* serious impairment of social or occupational functioning[,]" and "a 51–60 reflects the opinion that the subject has moderate symptoms *or* moderate impairment of social or occupational functioning." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 511 (6th Cir. 2006).

The ALJ accorded these scores "little weight," in part because such scores are "highly subjective" and do not represent "a longitudinal view of the claimant's functioning."  Furthermore, the ALJ reasoned that "in this case, the generally mild mental health findings contained in the record and minimal mental health treatment

33

do[] not support greater functional limitation than what is set forth in the above

[RFC], despite the low GAF scores."  (R. at 32; *see also* R. at 29, 30.)

The ALJ was permitted to discredit these scores.  As the Sixth Circuit has

observed, "according to the DSM's explanation of the GAF scale, a score may have

little or no bearing on the subject's social and occupational functioning."

*Kornecky*, 167 F. App'x at 511.  Furthermore, the Sixth Circuit has noted that it is

"not aware of any statutory, regulatory, or other authority requiring the ALJ to put

stock in a GAF score in the first place."  *Id.* at 511.

> ii.     **The ALJ properly credited the opinion of R.**
>         **Hasan, M.D. (state agency psychiatric**
>         **consultative examiner).**

Plaintiff claims that Dr. Hasan's opinion does not discuss Plaintiff's RFC in

terms of "work-related functions," as contemplated by SSR 96-8p, which concerns

assessing RFC in initial claims, and SSR 85-15, which concerns evaluating solely

non-exertional impairments.  (*See* DE 13 at 30-31.)

In his Step 4 RFC determination, the ALJ considered the January 29, 2013

psychiatric evaluation by R. Hasan, M.D., which concluded that Plaintiff is able to

"understand, follow and retain simple instructions[,]" and "manage [her] own

benefit funds."  (R. at 34, 290; *see also* R. at 29.)  In assigning Dr. Hasan's opinion

"great weight," the ALJ made two specific observations:  (1) Dr. Hasan's opinion

is *consistent* with his own "mild examination findings" of "occasional short term

memory problems;" "mild mood and self-esteem abnormalities" (in other words mood swings, depressed mood, mood disorder and low self-esteem); but otherwise "normal speech," described as spontaneous and logical; "fair eye contact;" and "some motivation and insight[,]" (R. at 34, 289; *see also* R. at 29), and (2) Dr. Hasan's opinion is *consistent* with the remaining record evidence, such as "some continued mood abnormalities," "occasionally impaired judgment, impulse control, and cognitive distortion," but otherwise "normal orientation," generally "normal thought processes and thought content," generally "fair memory skills," and "intact attention and concentration[.]"  (R. at 34.)

Thus, the ALJ considered the factor of consistency (*see* 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4)) when determining the weight assigned to Dr. Hasan's opinion and then provided "good reasons" for assigning it "great weight." Moreover, in twice commenting on Dr. Hasan's statement that Plaintiff "is able to understand, follow and retain simple instructions[,]" (*see* R. at 29, 34, 114, 126, 290), the ALJ expressly considered Plaintiff's ability to "understand, carry out, and remember instructions[.]"  SSR 96-8p.  If ALJ Pope did not also expressly comment on Plaintiff's ability to "use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting[,]" per SSR 96-8p, Plaintiff has not shown how such an omission entitled her to a different mental RFC than that assessed by

35

ALJ Pope.  (*See* DE 13 at 29-31, *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997) ("during the first four steps, the claimant has the burden of proof[.]").)

                    **iii.**     **The ALJ properly discounted the opinion of Edward Czarnecki, Ph.D. (non-examining state agency psychological consultant).**

In his Step 4 RFC determination, the ALJ considered the February 20, 2013 assessment by Dr. Czarnecki, who explained that Plaintiff's mental impairment "is not severe."  (R. at 34, 117-118, 129-130.)  Plaintiff claims that Dr. Czarnecki's opinion does not discuss Plaintiff's RFC in terms of "work-related functions," as contemplated by SSR 96-8p and SSR 85-15.  (*See* DE 13 at 30-31.)

To be sure, Plaintiff's argument as to Dr. Czarnecki assessment appears to be that it is not an adequate substitute for the allegedly similar omissions in Dr. Hasan's opinion.  (DE 13 at 30.)  However, the ALJ did properly discount this opinion, setting forth three reasons why he assigned this opinion "little weight." First, it is a non-examining determination.  Second, Dr. Czarnecki's opinion is *inconsistent* with the record as a whole, "which contains evidence of some, albeit mild, mental status examination findings of mood abnormalities, occasionally impaired judgment and impulse control, and occasional cognitive distortion and impaired short-term memory[.]"  Third, the ALJ noted that Dr. Czarnecki's February 20, 2013 assessment pre-dates Plaintiff's formal mental health treatment,

which appears to have been initiated on May 3, 2013 (R. at 378-380).  (*See* R. at

32.)  Thus, the ALJ considered 20 C.F.R. §§ 404.1527(c), 416.927(c) factors when

determining the weight assigned to Dr. Czarnecki's opinion and then provided

"good reasons" for assigning it "little weight."

### G.    Conclusion

In sum, I conclude that substantial evidence supports the ALJ's decision

denying benefits and, further, that the clarity of his opinion allows for meaningful

appellate review.  Accordingly, it is **RECOMMENDED** that the Court **DENY**

Plaintiff's motion for summary judgment (DE 13), **GRANT** Defendant's motion

for summary judgment (DE 14), and **AFFIRM** the Commissioner of Social

Security's decision.

## III.    PROCEDURE ON OBJECTIONS

The parties to this action may object to and seek review of this Report and

Recommendation, but are required to file any objections within 14 days of service,

as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule

72.1(d).  Failure to file specific objections constitutes a waiver of any further right

of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health &*

*Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some

issues but fail to raise others with specificity will not preserve all the objections a

party might have to this Report and Recommendation.  *Willis v. Sec'y of Health &*

*Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1273 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," *etc.*  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," *etc.*  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Dated: June 29, 2016                     s/Anthony P. Patti
                                         Anthony P. Patti
                                         UNITED STATES MAGISTRATE JUDGE

I hereby certify that a copy of the foregoing document was sent to parties of record on June 29, 2016, electronically and/or by U.S. Mail.

                                         s/Michael Williams
                                         Case Manager for the
                                         Honorable Anthony P. Patti

38